**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRAIG BOSTON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BUCKS COUNTY; PRIMECARE MEDICAL,** | : | **No. 20-cv-1980** |
| **INC.; ABBEY CASSIDY, Psy.D.; JESSICA** | : | |
| **MAHONEY, Psy.D.; WARDEN PAUL** | : | |
| **LAGANA; ACTING WARDEN DAVID** | : | |
| **GALIONE; SERGEANT MASON;** | : | |
| **CORRECTIONAL OFFICER MONOHAN** | : | |
| | : | |
| **Defendants.** | | |

## AMENDED COMPLAINT

## I. PRELIMINARY STATEMENT

1.      As acknowledged by the Bucks County District Attorney's Office, the Bucks County Correctional Facility ("BCCF") does not have the necessary staffing to properly detain and care for individuals with serious mental illness.[1]  Plaintiff Craig Boston, an individual with serious mental illness subject to pretrial detention, has been held in conditions of solitary confinement at BCCF for more than four years.  Over the course of these years, Mr. Boston has been locked, alone, in a cell the size of a parking space, for at least 23 hours per day, and often for 24 hours per day.  For approximately the past year, he has been kept on a diet of finger food—chips and cold cuts—with no access to fruits or vegetables.  He has not been permitted to

---

[1]      Tom Sofield, *Corrections Officers Cleared for Treatment of Woman, Mental Health Court Considered*, Levittownnow.com (July 12, 2020), *available at* https://levittownnow.com/2020/07/12/corrections-officers-cleared-for-treatment-of-woman-mental-health-court-considered/ (last visited Jan. 24, 2021) (District Attorney Weintraub stated that "the county prison would need a massive investment in staff to properly handle inmates with severe mental illness").

attend religious services, educational classes, or therapeutic or rehabilitative activities.  His mental health "treatment" has consisted of sessions lasting no more than a few minutes, during which a provider speaks with him through his cell door within the hearing of correctional officers and other incarcerated people.  Staff at BCCF often respond to his mental health crises with the use of restraint chairs and pepper spray.  As a result of these conditions of extreme isolation, the unreasonable use of force, and the lack of adequate medical treatment, Mr. Boston's mental and physical health have deteriorated.

2.      Because Defendants have failed to provide Ms. Boston with constitutionally adequate medical care and have kept him in inhumane and unconstitutional conditions, Plaintiff brings this civil rights action under 42 U.S.C. § 1983 and the Americans with Disabilities Act for compensatory and punitive damages and injunctive relief.

## II.  JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).  Venue is appropriate under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to these claims occurred in the Eastern District of Pennsylvania.

## III.  PARTIES

4.      Plaintiff Craig Boston was at all times relevant to this Complaint a resident of Bucks County, Pennsylvania.  He is currently detained at BCCF.

5.      Defendant Bucks County is a municipal government entity in the Commonwealth of Pennsylvania.  Bucks County manages and oversees BCCF, which is located at 1730 South Easton Road, Doylestown, PA 18901.

6.      Defendant PrimeCare Medical, Inc. ("PrimeCare"), which has a principal place of business at 3940 Locust Lane, Harrisburg, PA 17109, was, at all times relevant to this Complaint, the holder of a contract to provide all medical and mental health services to people incarcerated at BCCF.

7.      At times relevant to this Complaint, defendant Paul Lagana was the Warden of BCCF.   He is sued in his individual capacity.

8.      Defendant David Galione is currently the Acting Warden of BCCF.  He is sued in his individual and official capacities.

9.      At all times relevant to this Complaint, defendant Abbey Cassidy, Psy.D., was a psychologist employed by defendant PrimeCare and was assigned to work as the director of mental health at BCCF.  She is sued in her individual and official capacities.

10.     At all times relevant to this Complaint, defendant Jessica Mahoney, Psy.D., was a psychologist employed by defendant PrimeCare and was assigned to work at BCCF.  She is sued in her individual capacity.

11.     At all times relevant to this Complaint, defendant Sergeant Mason was employed by Bucks County as a correctional officer at BCCF.  He is sued in his individual capacity.

12.     At all times relevant to this Complaint, defendant Correctional Officer Monohan was employed by Bucks County as a correctional officer at BCCF.  He is sued in his individual capacity.

13.     At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.  FACTUAL ALLEGATIONS

### A. Solitary confinement's well-known and devastating effects
### on prisoners with mental illness

14.     Professionals working in the correctional environment, including the Defendants

in this matter, have long been aware that conditions of solitary confinement exacerbate and

worsen the mental and physical health of individuals with mental illness.

15.     Solitary confinement, also referred to as restrictive housing, segregation, or

isolation, is any type of detention that involves three basic elements: removal from the general

prisoner population, whether voluntary or involuntary; placement in a locked room or cell,

whether alone or with another prisoner; and inability to leave the room or cell for the vast

majority of the day, typically 22 hours or more.[2]

16.     Abundant psychiatric literature spanning nearly two hundred years has

documented the severely deleterious effects of isolation on mental health.  Isolation is

predictably damaging to prisoners with a pre-existing mental illness.  It poses a grave risk of

exacerbation of mental health symptoms, such as massive anxiety and panic attacks,

hypersensitivity, difficulty with concentration and memory, insomnia, compulsiveness,

uncontrollable rage, acute delusional states, social withdrawal, hopelessness, hallucinations, and

paranoia.  Deprived of the social interaction essential to keep them grounded in reality, many

---

[2]     *Porter v. Clarke*, 290 F. Supp. 2d 518, 528 (E.D. Va. 2018) (citing U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restrictive Housing 3 (Jan. 2016)).  *See Davis v. Ayala*, 576 U.S. 257, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring) (referring to the "usual pattern" of solitary confinement as being housed in "a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when [a prisoner] leaves it, he is allowed little or no opportunity for conversation or interaction with anyone"); *Wilkinson v. Austin*, 545 U.S. 209, 214, 223-24 (2005) (describing restrictive housing as limiting human contact for 23 hours per day).

prisoners with mental illness experience catastrophic and often irreversible psychiatric deterioration, causing significant psychological pain.

17.     The National Commission on Correctional Health Care's 2008 *Standards for Mental Health Services in Correctional Facilities* (NCCHC Standards) directs that "[i]nmates who are seriously ill should not be confined under conditions of extreme isolation."

18.     Similarly, the American Psychiatric Association (APA), in its Position Statement on Segregation of Prisoners with Mental Illness, found that prolonged segregation should be avoided for prisoners with serious mental illness due to the potential for harm to such prisoners. The APA defined "prolonged segregation" generally as segregation with a duration of greater than three to four weeks.

19.     Nearly four years ago, the Court of Appeals for the Third Circuit acknowledged "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement."[3]

20.     The Court also recognized the physical harm of prolonged solitary confinement, including high rates of suicide and self-mutilation—"behaviors believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation."[4]

---

[3]     *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017).  The *Palakovic* Court noted a "growing consensus—with roots going back a century" that prolonged solitary confinement can cause "severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity."  *Id.*

[4]     *Id.* at 226 (citing *Williams v. Sec'y of Pa. Dep't of Corr.*, 848 F.3d 549, 567-68 (3d Cir. 2017)).

**B. Defendants have long been aware that they are unequipped to properly detain and treat people with serious mental illness.**

21.     There is a long and well-known history of people with serious mental illness at BCCF being subjected to inhumane treatment and not receiving adequate medical care.

22.     In June 2020, news articles reported that Kimberly Stringer, who had a diagnosis of bipolar disorder and borderline personality disorder, had been detained in conditions of solitary confinement at BCCF for approximately two months.  She was housed alone in a bare cell, with only a suicide smock.  She was bruised and covered in her own urine and feces.  She had gone without a shower for weeks.  Correctional officers used pepper spray on her, forced her to the shower, and then put her in a restraint chair.[5]

23.     After investigating the treatment of Ms. Stringer, Bucks County District Attorney Matt Weintraub acknowledged that BCCF did not have the necessary staff to "properly handle inmates with severe mental illness."[6]

24.     District Attorney Weintraub also found that BCCF's own policies and procedures permitted the correctional officers to use pepper spray on Ms. Stringer, force her into the shower, and put her in a restraint chair.

---

[5]     Brett Sholtis, *'She's breaking down': Inmates at Bucks County jail decry treatment of suicidal woman with severe mental illness*, WHYY (June 15, 2020), *available at* https://whyy.org/articles/shes-breaking-down-inmates-at-bucks-county-jail-decry-treatment-of-suicidal-woman-with-severe-mental-illness/ (last visited Jan. 24, 2021).

[6]     Tom Sofield, *Corrections Officers Cleared for Treatment of Woman, Mental Health Court Considered*, Levittownnow.com (July 12, 2020), *available at* https://levittownnow.com/2020/07/12/corrections-officers-cleared-for-treatment-of-woman-mental-health-court-considered/ (last visited Jan. 24, 2021).

25.     A later news article revealed that BCCF commonly responded to people experiencing severe mental health crises by placing them in isolation, placing them in restraint chairs, using pepper spray, using force to extract them from their cells, and forcing them into showers.[7]  Defendant Cassidy was one of the treating prison psychologists for these individuals and, as the director of mental health care at BCCF, she was the medical professional in charge of overseeing their treatment.

26.     Between mid-April and mid-June 2020, BCCF reports regarding incidents in which correctional officers used force reveal that over one-third of those incidents involved individuals engaging in self-harm or suicide attempts or with a diagnosed mental illness.[8]

27.     According to behavioral health experts, as reported in public news articles, such tactics show that the prison was unequipped to deal with people in mental health crisis.[9]

### C.  Defendants have detained Mr. Boston in inhumane conditions of solitary confinement and have failed to provide him with adequate mental health care.

28.     Craig Boston was admitted to BCCF on or about August 14, 2016, after being arrested for attempted murder and related charges.

29.     During his intake screening, Mr. Boston reported that his mother had previously attempted suicide, that he himself had been diagnosed with schizophrenia, that he had multiple previous psychiatric hospitalizations, and that he took Seroquel, a prescription medication that is used to treat conditions including schizophrenia and bipolar disorder.

---

[7]     Brett Sholtis, *Bucks County Cases Bring Spotlight to How Those With Mental Illness Are Treated*, Levittownnow.com (Sept. 1, 2020), *available at* http://levittownnow.com/2020/09/01/bucks-county-cases-bring-spotlight-to-mental-health/ (last visited Jan. 25, 2021).

[8] *Id.*

[9] *Id.*

30.     Thus, from the start of his detention at BCCF, prison officials and medical staff, including Defendants, were aware of his history of serious mental illness.

31.     However, despite his mental illness, Mr. Boston was immediately placed in the Restrictive Housing Unit ("RHU"), a solitary confinement unit.

32.     From August 2016 to February 2019, with the exception of sporadic periods of time that totaled no more than a few months, Mr. Boston was detained in either the RHU or the Mental Health Unit ("MHU") of BCCF and kept in conditions of solitary confinement.

33.     While in solitary confinement, alternatively called "lock" status, Mr. Boston was, and currently is, subject to the following conditions:

> a.   He is locked, without a cellmate, in a cell that he has alternatively described as being about the size of a parking spot or about the size of six refrigerators.
>
> b.   On weekdays, he is permitted out of his cell for only 45 minutes to an hour to go to an outdoor cage for solitary exercise.  However, because Mr. Boston is given medication at 4:30 a.m., which is strong and makes him tired, he often is unable to take advantage of his this out-of-cell time, which is offered at 6:30 a.m.
>
> c.   On weekends, he is locked in his cell 24 hours per day.
>
> d.   He is permitted to shower only three times a week, on Monday, Wednesday, and Friday.
>
> e.   He is not given access to religious services, the law library, nor any out-of-cell educational, therapeutic or rehabilitative activities.

34.     In February 2019, Mr. Boston was transferred to Norristown State Hospital due to a pretrial finding of incompetency in his criminal matter.

35.     While at Norristown State Hospital, Mr. Boston was not confined to a cell.  He spent time with other individuals in a day room, he had access to a game room, and he attended individual and group therapy.

36.     In July 2019, after receiving mental health treatment at Norristown State Hospital, medical professionals there determined that Mr. Boston's mental health had improved, he was deemed competent, and he was returned to BCCF.

37.     Back at BCCF, Mr. Boston was again placed in solitary confinement—and he has remained confined in such conditions from July 2019 through the present.

38.     The conditions of solitary confinement caused Mr. Boston's mental health to deteriorate and triggered mental health crises.

39.     Prolonged solitary confinement caused Mr. Boston to start hearing voices, to experience increased aggression, and to display symptoms that he describes as psychotic—which he had not exhibited at the start of his time at BCCF.

40.     Physical manifestations of Mr. Boston's mental health crises include attempts at self-strangulation, slicing off his own nipple with a staple, cutting himself with razors, picking at scabbed wounds until they started bleeding again, banging his head against the wall, refusing to eat, throwing bodily fluid or feces, and refusing medication.  These attempts have resulted in approximately one trip to the hospital after he was found unconscious, two trips to the hospital for stitches to severed veins, and approximately three occasions in which he received stitches at BCCF.

41.     With Defendants Lagana's, Cassidy's, Mahoney's, and Galione's knowledge and acquiescence, or at their direction, correctional staff respond to some of these incidents of mental health crises through the use of pepper spray.

9

42.     Mr. Boston estimates that correctional staff at BCCF have used pepper spray on him on over ten occasions in response to his mental health crises.

43.     On at least one occasion, correctional officers used pepper spray solely because Mr. Boston covered his window with his mattress.

44.     On another occasion, on or around October 10, 2020, Correctional Officer Monohan and/or Sergeant Mason used pepper spray against Mr. Boston after he refused to move his hand from the food tray slot in his cell door because he wanted something to eat besides finger food.

> a.   After being pepper sprayed, Mr. Boston was forcibly rinsed off, taken to the medical unit, and then returned to his cell where he was left naked and with no smock or mattress.

> b.   When Mr. Boston complained about being left naked in his cell, Sgt. Mason and Correctional Officer Monohan came into the cell, shoved him, punched him, slammed his head into the wall, and then continued to leave him naked in his cell.

45.     On another occasion, on or around January 26, 2021, Sgt. Sherman used pepper spray against Mr. Boston after he refused to move his hand from the food tray slot in his cell door because he wanted to report something wrong with his food.  As a result of this incident, Defendants Cassidy and/or Mahoney placed Mr. Boston on mental health "watch" status, described in more detail below, even though he had not engaged in any self-harming activity.

46.     With Defendants Lagana's, Cassidy's, Mahoney's, and Galione's knowledge and acquiescence, or at their direction, correctional staff often respond to these incidents of mental

health crises through the use of a restraint chair—where one's legs and arms are forcibly attached to a chair.

47.   Mr. Boston estimates that he has been placed in a restraint chair on more than 15-20 occasions.

48.   He is placed in a restraint chair for four hours at a time.

49.   When in a restraint chair, he is not permitted to go to the bathroom and he has been forced to urinate on himself while attached to the restraint chair.

50.   With Defendants Lagana's, Cassidy's, Mahoney's, and Galione's knowledge and acquiescence, or at their direction, correctional staff respond to some of these incidents of mental health crises by placing Mr. Boston on mental health "watch" status.

51.   While on "watch," Mr. Boston is placed in even more severe conditions than when he is on "lock" status:

   a.   He continues to be locked alone in a cell the size of a parking space or six refrigerators.

   b.   He is not permitted out of his cell at all—not for showers nor for exercise.

   c.   The lights in his cell are kept on 24 hours a day—causing disorientation and difficulty sleeping.

   d.   He is allowed only a suicide smock and a mattress in his cell.

   e.   He is not permitted to have writing, reading, or legal materials.

   f.   He has no access to religious services, educational classes, therapeutic activities, nor rehabilitative activities.

52.   Mr. Boston estimates that he has been placed on watch approximately twenty times.

53.     On occasion, Mr. Boston has been kept on watch conditions for over 30 days at a time.

54.     However, even while on watch, Defendants Lagana, Cassidy, Mahoney, and Galione, and the correctional staff Lagana and Galione supervised, failed to prevent Mr. Boston's access to instruments used to harm himself—including pieces of razors and pieces of plastic.

55.     For example, on or around February 11, 2020, Mr. Boston wrote to Defendant Lagana and attached to his correspondence a razor.  The razor had been given to Mr. Boston by an inmate watch monitor who told Mr. Boston to kill himself.

56.     Defendants Lagana, Cassidy, Mahoney, and Galione have authorized and directed the use of watch conditions under the guise of protecting Mr. Boston from engaging in self harm, but they have done so knowing or recklessly disregarding that the prolonged and uninterrupted use of such measures exacerbates and aggravates the very conditions that have increased Mr. Boston's risk of harming himself.

57.     Defendants Lagana, Cassidy, Mahoney and/or Galione have also authorized, directed, and/or acquiesced in the use of watch conditions as a way to punish Mr. Boston for failing to follow directions rather than as a reaction to any threats of self-harm by Mr. Boston.

58.     For approximately the past year, Mr. Boston has been restricted to a diet of "finger food"—chips and cold cuts—with no fruits or vegetables.

59.     He has been given no milk or juice and is only able to hydrate by using his hands to drink water from the sink in his cell.

60.     Mr. Boston's physical health has suffered due to his conditions of confinement. He has suffered weight loss, high blood pressure, daily headaches, blurred vision, and pain in his arm, shoulders, and neck.

61.     While detained in solitary confinement and/or on watch conditions at BCCF, Mr. Boston has not received adequate mental health treatment.

62.     His treatment from mental health staff has consisted of cell-side sessions during which medical staff yell at him through the cell door.

63.     These sessions typically last a matter of minutes, sometimes less, and often consist of the mental health provider asking the same four questions: "Are you suicidal?  Are you homicidal?  Are you eating?  Do you need anything?"

64.     There is no privacy during these sessions, as they are conducted within the hearing of correctional officers and other incarcerated people.

65.     This lack of privacy has occasionally caused Mr. Boston to refuse to participate in these "drive-by" sessions.

66.     Correctional officers have mocked Mr. Boston for his answers or for crying during these cell-door sessions—also causing him to be reluctant or refuse to participate in these "drive-by" sessions.

67.     These sessions do not constitute meaningful mental health treatment.

68.     While at BCCF, Mr. Boston has not received private counseling, private individual psychotherapy, group therapy, nor any therapeutic activity.

69.     While at BCCF, Defendants have not developed an individual mental health treatment plan for Mr. Boston.

**D.  Defendants caused, were aware of, and/or
were deliberately indifferent to these inhumane conditions of
prolonged solitary confinement and the lack of adequate medical treatment.**

70.     Defendants Lagana, Galione, Cassidy, and Mahoney were aware of Mr. Boston's serious mental illness and the inhumane conditions of his confinement.

71.     Defendant Lagana, as Warden of BCCF, had access to Mr. Boston's medical records.

72.     Defendant Lagana, as Warden of BCCF, directed, approved, and/or acquiesced in placing Mr. Boston in conditions of punitive and administrative segregation and "lock" status, which resulted in his being held in prolonged solitary confinement.

73.     In directing, approving, or acquiescing in the placement of Mr. Boston in conditions of punitive segregation, Defendant Lagana failed to consider Mr. Boston's serious mental illness and how it impairs his ability to follow instructions.

74.     On multiple occasions, Mr. Boston wrote to and directly spoke with Defendant Lagana about his despair and mental decline and requested more time out of his cell.

75.     Defendant Cassidy, as a psychologist who purportedly treated Mr. Boston and as director of mental health at BCCF, reviewed Mr. Boston's medical records and spoke with Mr. Boston.

76.     Mr. Boston directly wrote to and spoke with Defendant Cassidy about his despair and mental decline and requested more time out of his cell.

77.     Defendant Mahoney, as a psychologist who purportedly treated Mr. Boston at BCCF, reviewed Mr. Boston's medical records.

78.     Mr. Boston directly spoke with Defendant Mahoney about his despair and mental decline and requested more time out of his cell.

14

79.     Defendants Cassidy and Mahoney directed, approved, and/or acquiesced in placing Mr. Boston on extended periods of mental health or suicide "watch" with its accompanying restrictive conditions—despite evidence that extended watch conditions exacerbated Mr. Boston's illness.

80.     Defendants Cassidy and/or Mahoney have also authorized, directed, and/or acquiesced in placing Mr. Boston on mental health or suicide "watch" with its accompanying restrictive conditions as a way to punish Mr. Boston for failing to follow directions rather than as a reaction to any threats of self-harm by Mr. Boston.

81.     Defendant Cassidy, as mental health director at BCCF, directed, approved, and/or acquiesced in placing Mr. Boston on prolonged periods of "lock" or administrative segregation status due to his mental health status.

82.     Defendants Lagana, Cassidy, and Mahoney met on multiple occasions to speak about Mr. Boston, his mental illness, and his conditions of confinement.  As such, they were aware of his solitary confinement conditions and his mental health crises, including his attempted suicides, instances of self-mutilation and self-harm, refusals to eat, and his throwing of bodily fluids and feces.  They were also aware that pepper spray and restraint chairs were often used on Mr. Boston in response to his mental health crises.

83.     Yet, even though Defendants Lagana, Cassidy, and Mahoney were aware of Mr. Boston's serious mental illness, they failed to provide adequate mental health care and failed to develop an individual treatment plan for Mr. Boston.  They failed to provide for private individual therapy or group therapy or any therapeutic activity at all.  Instead of providing individualized treatment for Mr. Boston's serious mental illness, Defendants instead relied solely on medication, isolation, and the use of force.

84.    Defendant Galione, as acting Warden of BCCF starting in December 2020 or January 2021, is responsible in his official capacity for Mr. Boston's current conditions of confinement.

85.    As current acting Warden, Defendant Galione has access to Mr. Boston's medical records.

86.    As current acting Warden, Defendant Galione directed, approved, and/or acquiesced in Mr. Boston's placement in conditions of prolonged solitary confinement or "lock" status for administrative and/or punitive reasons.

87.    In directing, approving, or acquiescing in the placement of Mr. Boston in conditions of punitive segregation, Defendant Galione failed to consider Mr. Boston's serious mental illness and how it impairs his ability to follow instructions.

88.    Given the similarities between the treatment of Mr. Boston and the treatment of other mentally ill individuals at BCCF, as described in media reports, and given District Attorney Weintraub's conclusion that BCCF did not have adequate staff to properly treat individuals with serious mental illness, the violations of Mr. Boston's constitutional rights were a result of the policies, practices, procedures, and customs of Defendants PrimeCare and Bucks County.

89.    At all times relevant to this Complaint, Defendants PrimeCare and Bucks County, with deliberate indifference, failed to develop and implement policies, practices, and procedures and failed to employ sufficient trained staff to ensure that individuals with serious mental illness and in mental health crisis receive adequate individualized mental health treatment, including an individual treatment plan.

90.    At all times relevant to this Complaint, Defendants PrimeCare and Bucks County, with deliberate indifference, were aware of a policy, practice, and/or custom of treating

16

individuals with serious mental illness who were in mental health crises by placing them in extended periods of isolation and solitary confinement without consideration of their mental illness and without adequate therapeutic interventions.

91.     At all times relevant to this Complaint, Defendants PrimeCare and Bucks County, with deliberate indifference, failed to properly train, supervise, and discipline their respective employees so as to ensure that prisoners with serious mental illness would not be subjected to unreasonable use of force or increased risk of substantial harm.

92.     At all times relevant to this Complaint, Defendants PrimeCare, Bucks County, Lagana, Galione, Cassidy, and Mahoney were aware of Mr. Boston's serious mental illness and serious medical needs and failed, with deliberate indifference, to ensure that Mr. Boston received adequate medical and mental health treatment.

93.     In the alternative, Defendants Lagana, Galione, Cassidy and Mahoney made intentional decisions with regard to Mr. Boston's treatment which placed Mr. Boston at substantial risk of suffering serious harm.  These defendants did not take reasonable available measures to abate that risk, even though a reasonable correctional professional and/or psychologist in the circumstances would have appreciated the high degree of risk involved, thereby making the consequences of Defendants' conduct obvious.

94.     Mr. Boston is a qualified individual with a disability under federal law.

95.     Mr. Boston is an individual with serious mental illness, with diagnoses of schizophrenia, schizoaffective disorder, and major depression with psychosis symptoms.

96.     Mr. Boston's mental illness substantially limits nearly every aspect of his daily life, including his ability to care for himself and other major life activities such as concentrating, thinking, communicating, and following instructions or directions.

17

97.     When Mr. Boston is deprived of appropriate mental health interventions, opportunities for social interaction, opportunities to participate in educational programming, showers, and outdoor recreation, as outlined above, he is deprived of services, programs, or activities of Defendant Bucks County, by reason of his disability.

98.     By permitting Mr. Boston to be placed in punitive segregation without consideration for his mental illness and how it impacts his ability to follow instructions or directions, Defendant Bucks County fails to provide him with reasonable accommodations that would allow him equal access and benefit to the programs, services, and activities at the jail.

99.     At all times relevant to this Complaint, the conduct of all Defendants was in willful, reckless, and callous disregard of Mr. Boston's rights under federal and state law.

100.    As a direct and proximate result of the conduct of all defendants, Mr. Boston has experienced enormous physical and emotional pain and suffering.

## V.  CLAIMS FOR RELIEF

### COUNT 1
### Federal Constitutional Claim
### Inhumane and unconstitutional conditions of confinement
### Plaintiff v. Defendants Lagana, Cassidy, Mahoney and Galione

101.    In violation of Mr. Boston's rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, Defendants Lagana, Cassidy, Mahoney, and Galione were, and are currently, deliberately indifferent to Mr. Boston's inhumane and unconstitutional conditions of confinement at BCCF, including the deprivation of showers and out-of-cell time for exercise and the prolonged use of solitary confinement on an individual with serious mental illness.  These conditions resulted in a serious deprivation of Mr. Boston's basic human needs and caused him harm, pain, injury, and mental suffering.

102.     As a pretrial detainee, Mr. Boston has a right to be free from punishment. The

conditions to which Defendants have subjected Mr. Boston bear no rational relationship to any

legitimate non-punitive government purpose and/or are excessive in light of any legitimate non-

punitive purpose they serve.

## COUNT 2
### Federal Constitutional Claim
### Failure to Provide Adequate Mental Health Care
### Plaintiff v. Defendants Lagana, Cassidy, Mahoney and Galione

103.     In violation of Mr. Boston's rights under the Eighth and/or Fourteenth

Amendments to the United States Constitution, Defendants Lagana, Cassidy, Mahoney and

Galione were, and are currently, deliberately indifferent to Mr. Boston's serious need for

adequate and individualized medical and mental health care, thereby causing him harm, pain,

mental suffering, injury, and an exacerbation of his mental illness.

104.     As a pretrial detainee, Mr. Boston has a right to be free from punishment.

Defendants' failure to provide him with adequate mental health care bears no rational

relationship to any legitimate non-punitive government purpose and/or is excessive in light of

any legitimate non-punitive purpose it serves.

## COUNT 3
### Federal Constitutional Claim
### Excessive and/or Unreasonable Use of Force
### Plaintiff v. Defendants Mason and Monohan

105.     In violation of Mr. Boston's rights under the Eighth and/or Fourteenth

Amendments to the United States Constitution, Defendants Mason and Monohan, maliciously

and for the purpose of causing harm, used excessive force against Mr. Boston on or about

October 10, 2020, as described in the paragraphs above, causing him pain and/or physical injury.

106.     Alternatively, in violation of Mr. Boston's rights under the Fourteenth Amendment to the United States Constitution, Defendants Mason and Monohan knowingly used force against Mr. Boston on or about October 10, 2020, as described in the paragraphs above. That force cased Mr. Boston harm, pain, and/or physical injury.  This use of force was objectively unreasonable in light of the facts and circumstances at the time.

107.     As a pretrial detainee, Mr. Boston has a right to be free from punishment. Defendants' use of force bore no rational relationship to any legitimate non-punitive government purpose and/or was excessive in light of any legitimate non-punitive purpose it serves.

**COUNT 4**
**Federal Constitutional Claim**
***Monell* Liability**
**Plaintiff v. Defendants PrimeCare and Bucks County**

108.     Defendants PrimeCare and Bucks County, with deliberate indifference, adopted and/or acquiesced in policies, practices, customs and/or procedures which were the direct and/or proximate cause and/or moving force in the violations of Mr. Boston's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution.

109.     Defendants PrimeCare and Bucks County, with deliberate indifference, failed to properly train, supervise and/or discipline its employees and, as such, were the direct and/or proximate cause and/or moving force in the violations of Mr. Boston's constitutional rights under the Eighth and/or Fourteenth Amendments to the United States Constitution.

**COUNT 5**
**Title II, Americans with Disabilities Act, 42 U.S.C. § 12132**
**Plaintiff v. Defendant Bucks County**

110.     Mr. Boston is a qualified individual with a disability as defined under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.  Defendant Bucks County, with deliberate indifference, failed to provide adequate mental health care for prisoners in its custody,

20

failed to prevent the unconstitutional use of prolonged isolation on a mentally ill individual, and failed to prevent the unreasonable use of force on mentally ill individuals in its custody, and, as such deprived Mr. Boston of the benefits of Bucks County's services, programs, or activities on account of his disability and discriminated against him on the basis of his disability. Defendant Bucks County also failed to provide Mr. Boston with reasonable accommodations that would allow him equal access and benefit to the programs, services, and activities at the jail.

### COUNT 6
### State Law Professional Negligence Claims
### Plaintiff v. Defendants Cassidy, Mahoney, and PrimeCare

111.    Defendants Cassidy and Mahoney had a duty to comply with generally accepted medical and mental health standards of care in their treatment of Mr. Boston.

112.    Defendants Cassidy and Mahoney violated their duty of care.

113.    The defendants' violation of their duty of care to Mr. Boston was a direct and proximate cause and a substantial factor in bringing about plaintiff's damages as outlined above, and, as a result, defendants are liable to plaintiff.

114.    Because the individual defendants were acting as agents, servants, and/or employees of defendant PrimeCare, and because the individual defendants were acting within the scope and course of their employment, and under the direct control and supervision of defendant PrimeCare, defendant PrimeCare is liable to plaintiff on the basis of *respondeat superior* liability.

### VI.  REQUESTED RELIEF

**Wherefore**, plaintiff respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Lagana, Cassidy, Mahoney, Galione, Mason,

Monohan, and PrimeCare;

C.      Declaratory relief and injunctive relief to stop the constitutional violations

described above and to ensure that Mr. Boston receives constitutionally adequate

mental health care;

D.      Reasonable attorneys' fees and costs;

E.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

Respectfully submitted,

/s/ Susan M. Lin
Susan M. Lin
I.D. No. 94184
KAIRYS, RUDOVSKY, MESSING, FEINBERG
 & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)
slin@krlawphila.com

 /s/ Matthew A. Feldman
Matthew A. Feldman
Attorney I.D. # PA 326273
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966
F: 215-925-5337
mfeldman@pailp.org

*Counsel for Plaintiff*

DATE: January 29, 2021